# JEREMIAH GOODWIN *et al.*

## *v.*

## RUSSELL C. MIX *et al.*

1. TRUSTEES—*presumption that they act honestly and do their duty.* It is a presumption of law, that officers and trustees act honestly and do their duty, and the burthen of proof is upon those who seek to impeach their conduct in those respects.

2. So where a creditor for whose benefit his debtor has made an assignment, seeks to impeach a sale of the property by the assignees, either upon the ground of their neglect of duty, or that they have acted fraudulently, he is bound to show such misconduct by affirmative evidence, or by strong circumstances.

3. SAME—*inadequacy of price, as evidence of fraud.* It does not follow, because the assignees may have sold the property at prices far below its estimated value, that the sale was not fair, or that it was in fraud of the rights of creditors.

4. ASSIGNMENT—*for the benefit of creditors—duty of the assignees.* Where a debtor makes an assignment of his property for the benefit of his creditors, the assignees succeed to all the rights of the debtor in the property, and receive it with all its burdens. It is their duty to take charge of it, to preserve and protect it until it can be sold, and to sell it to the best advantage for the beneficiaries, and within such reasonable time and manner as that the highest price shall be obtained for it.

5. It is the duty of the assignees to manage the trust confided to them with all the care, caution and diligence a prudent owner of like property would under the circumstances, and to observe good faith in all their transactions in relation to it, and must be held to a strict accountability.

6. SAME—*sale must be fair.* And if such persons, acting in a fiduciary character, make declarations or do acts which prevent competition at a sale of trust property, or which causes a sacrifice of the property, the sale should be set aside at the instance of any beneficiary injured thereby.

7. SAME—*of grounds for the removal of the assignees.* If the creditors interested in an assignment apply to the assignees to see an inventory of the property with appraisements of value and the assignees exhibit an inventory without such appraisement, denying that they have any other, when in fact they have such an appraisement as was called for, and intended to deceive, and did deceive, the creditors to their injury, by the statement made, no court would hesitate to remove them.

8. JUDGMENTS—*by confession—if irregular, how to be questioned.* If irregularities intervene in the confession of a judgment, they can not be taken advantage of in a collateral proceeding. Until reversed for irregularity, they can be enforced.

9 ⸱ PURCHASER—*under a judgment, protected against its reversal.* And if such a judgment should be reversed, a *bona fide* purchaser under it would be protected.

APPEAL from the Circuit Court of Cook County.

This was a suit in chancery commenced in the Circuit Court of Kane County, and subsequently removed into the Circuit Court of Cook County, upon change of venue.

The facts of the case appear in the opinion of the Court.

Mr. S. WILCOX, for the appellants.

Mr. B. F. PARKS, for the appellees.

Mr. JUSTICE BREESE delivered the opinion of the Court:.

The facts of this case are, substantially, as follows: Erasmus Woodworth and Alvin Woodworth, on the eighteenth day of November, 1859, were doing business as partners in the manufacture of wagons, on a large scale, in Aurora, in Kane County, and being much involved in debt, with a large stock of materials used in their business on hand, and other personal property, and possessed of valuable real estate in that city and elsewhere, made an assignment on that day, of all real and personal property, to two of the defendants, Russel C. Mix and William V. Plum, for the benefit of creditors, of whom these complainants, under the firm of J. Goodwin & Co., were one, and preferred to the extent of eight hundred dollars.

At the time of making the assignment, a large portion of the real estate, and the most valuable, was encumbered by deeds of trust, one of them to one Huntoon, to secure three

thousand seven hundred dollars, due May 17, 1859, with inter-
est at ten per cent., after due; another one to Charles Patten,
dated June 1, 1858, to secure two notes of that date, one for
three hundred dollars, payable six months after date, and the
other for three thousand dollars, payable one year after date.
The note for three hundred dollars, and a portion of the note
for three thousand dollars had been paid at the date of the
assignment.    These deeds of trust were upon what is called in
the pleadings, "the stone shop" premises, being lot seven, in
block one, and an adjoining piece of ground in the same block,
in the original town of Aurora, and was considered the most
valuable single portion of the real estate.

On lots three and four in block two, being the residence of
Erasmus Woodworth, there was a deed of trust for the benefit
of George Hadden, to secure two thousand two hundred and
eighty-three dollars and thirty-three cents.    Upon a tract of
land containing three and three-fourths acres, being the resi-
dence of Alvin Woodworth, there was a mortgage in favor of
E. Judson for about two thousand dollars, but on which not
more than thirteen hundred dollars was really due.    Upon the
Kendall County farm, containing 141.66 acres, there was a
mortgage held by George Hadden, of about two thousand and
eighty-one dollars.    On an execution in favor of Brooks and
Breed, certain real estate had been sold on the 27th of Octo-
ber, just preceding the assignment, for twenty dollars, consist-
ing of lot one in block three, in Lake's addition—lot twelve
in block five, in Holbrook's addition—lot ten, in King's sub-
division of block twenty-seven in Stevens' addition, and lot
seven, in Hinds' sub-division of block twenty-eight, in the
same addition.

Some other portions of the real estate namely: Lots one
and two, in Hall's addition, and a tract of forty acres not
particularly designated, were not incumbered, but were of
small value.

There were executions in the hands of the proper officers,
issued by a justice of the peace, amounting to about four

hundred and seventy-five dollars. There was an execution in favor of Sutherland, for four hundred and seven dollars and fifty-nine cents. Benjamin F. Fridley, at the time of the assignment, held eleven judgment notes against the Woodworths, on which, on the day of the assignment, and before it was perfected ten judgments were entered up on warrants of attorney in vacation. The amount of these judgments, in the aggregate, was eight thousand seven hundred and eighty-three dollars, or thereabouts, and on each of them, executions were sued out, and in the hands of the officer on the day of the assignment. The whole amount of these various incumbrances was twenty-three thousand and forty-nine dollars.

Opinions differed very much, as to the cash value of this property encumbered as it was. It was valuable property and worth more than it brought at the sale. The real estate, unincumbered except by judgments, was valued at about fourteen hundred dollars.

The testimony in regard to the value of the personal property, was somewhat conflicting, but may be set down, exclusive of *choses in action*, at about twenty-three thousand dollars. The greatest portion of this property was materials for wagons and other articles of that kind, requiring a large outlay of money and labor to make them produce money in market. The choses in action, amounted nominally, to about fourteen hundred and sixty-nine dollars, consisting of notes and accounts, about one-half of which were collected, and the balance remained in judgment. There were also two notes on hand undisposed of by the assignees, amounting to one hundred and seven dollars. A few articles of small value, and eight head of cattle and one horse, were sold by the assignees at private sale, and one-half of the Kendall County farm. The bulk of the property was sold at public auction, after being advertised in the newspaper of the town, and bidders attended as is usual at such sales.

The whole amount realized from it by the assignees, was fourteen hundred and ninety-six dollars, and they paid out on

the same account about fifteen hundred and fifteen dollars, leaving nothing for complainants or other preferred creditors.

On this result being known, the complainants in behalf of themselves and of all other creditors of the Woodworths, who might come in under the assignment, and contribute to the expenses of the suit, filed their bill in chancery, seeking to make the assignees, Mix and Plum, account for and pay over what should and could have been realized from the property assigned to them, had it been rightly, prudently and fairly managed, and they also seek to follow the property in the hands of Taylor, Butterworth, Keith and Snell, the other defendants, and have them treated as trustees holding the property for the benefit of the creditors under the assignment.

It appears that nearly all the property was purchased by these last named defendants, and came into their possession.

The bill charges that if Mix and Plum had used reasonable diligence, prudence and judgment, in the management and disposal of the property, money enough would have been realized from it, over and above discharging all liens and incumbrances, to have satisfied the debts to the preferred creditors; and charges that the assignees fraudulently disposed and rid themselves of the property in such manner as to realize nothing, or if they did not intend to defraud, they were guilty of negligence and mismanagement, by which the rights and interests of the complainants were sacrificed, and that the assignees should be responsible for the loss. And the bill further charges, that the other defendants participated in the fraud, or at least knew of it before, and when they purchased, or if there was no fraud, they knew of the negligence and mismanagement of the assignees, and knew that the property was trust property, and knew that the assignees were violating the trust. The bill also charges that there was collusion between the defendants to the end that Taylor, Butterworth, Keith and Snell, might get the property at a cost not to exceed the incumbrances and liens upon it, and that the defendants so conducted in relation to the various sales of the property, as to prevent competition,

and that they sacrificed the property, and charges that the sales were not fair and open sales but void, and that those defendants are not *bona fide* purchasers of any of the property.

The bill, besides praying as above stated, prayed for an account against the assignees, and for general relief.

The Woodworths failed to answer the bill, and it was taken as confessed against them. The other defendants answer in full, denying every material statement and charge in the bill, going to impeach the fairness of their conduct in the premises, and deny that the property was of the value charged.

Much proof was taken in the cause, and the Circuit Court, on a full hearing on the merits, denied the prayer of the bill and the relief sought, and dismissed the bill.

The cause is brought here by appeal, and this decision of the Circuit Court, is assigned as error.

The appeal has been argued with great ability on both sides, and we have examined the testimony carefully, on which a proper decision of the case wholly depends, as there is no conflict, whatever, on the law of the case. Every principle of law invoked by the counsel of appellants, is conceded, and nothing remains for consideration but the facts in the case.

The counsel for appellants admit the presumption of law, that officers and trustees act honestly and do their duty, and that the burden of proof in this case, is upon the creditors to show that Mix and Plum did not act honestly, or did not do their duty, by reason of which the creditors have sustained loss.

Starting on this principle, the correctness of which no one will deny, the complainants are bound to show, by affirmative evidence, or by strong circumstances, that the assignees have been negligent in their duty, or that they have acted fraudulently, and have colluded with the other defendants to the end, that the assigned property should pass into their hands for a sum not exceeding the liens and incumbrances upon it, and that it was worth much more than they bid for it, and would have brought more if properly managed. This is the charge in the bill, and complainants are bound to prove it.

It is true a very large amount of valuable property has been sold at prices far below its estimated value, but it does not follow, from that fact, that the sale was not fair, or in fraud of the rights of creditors.

This case is to be regarded in two aspects. First, as to the conduct of the assignees, Mix and Plum, and next, as to the conduct of the other defendants in the transactions.

The assignees, as such, succeeded to all the rights which the Woodworths had in the property, and received it with all its burdens. It was their duty to take charge of the property, to preserve and protect it until it could be sold, and to sell it to the best advantage for the beneficiaries, and in such reasonable time and manner as that the highest price should be obtained for it. It was their duty to manage the trust confided to them with all the care, caution and diligence a prudent owner of like property would, under the circumstances, and to observe good faith in all their transactions in relation to it, and must be held to a strict accountability. We hold, too, that if such persons, acting in a fiduciary character, make declarations or do acts which prevent competition at a sale of trust property, or which cause a sacrifice of the property, the sale should be set aside, at the instance of any beneficiary injured thereby. There is no known and acknowledged rule of law applicable to such cases we should hesitate to sanction. But in all such cases, the charge should be clearly substantiated. Some certain and defined act or declaration should be established, something more than the mere fact that the property did not fetch as much as many persons well acquainted with it believed it should have fetched.

The assignees received this property, smothered up, so to speak, under a load of incumbrances, and at a time when every department of business was in an embarrassed condition. The Woodworths were enterprising men, and had many friends disposed to assist them in their difficulties. Their creditors, in general, were very anxious to render them all the aid they could, and the citizens, generally, believed it would be a public

calamity if their extensive establishment should be closed, and the busy hum of industry no longer heard within its walls. Meetings of friends and creditors were had to devise ways and means by which they would be enabled to continue their business, and the complainants were entreated to join in some arrangement by which the property might be made to pay the liabilities of the concern. They steadily refused every overture, and would agree to nothing in aid of the plans the friends of their debtors had proposed.

It is shown also that the complainants, in the fall of 1860, not being satisfied with the manner in which the assignees were conducting the business of the assignment, called on them for an inventory, or to be permitted to take a copy of the inventory of the property. An inventory was shown them containing no appraisement of values, and Plum stated that they had no inventory with appraisement of value. The complainants were satisfied that the assignees did not tell the truth when they made this statement, as they had such an inventory. Now, it was the clear duty of these complainants, if they believed the assignees were acting unfairly and deceitfully in this regard, to have had them removed from the trust. If it were true the assignees intended to deceive by the statement made, and did deceive the complainants thereby to their injury, no court would have hesitated to remove them. Again, if the complainants knew the assignees were pursuing a course not warranted by law and contrary to their duty as assignees, the remedy was in their own hands, by filing a bill for their removal, setting forth the facts. But they did nothing of the kind, nor did they protest against any of the acts of the assignees, the most or all of which were passing in view of them, until the final consummation.

We have examined the testimony in this case with great care, and we can not find any which establishes fraud on the part of the assignees, nor do we discover any act of theirs in the management of this trust, properly chargeable to a desire or intention on their part, to deprive the creditors of the avails of the

property, or that it should not fetch the highest price when offered to be sold. The assignees themselves were preferred creditors to the amount of at least one thousand dollars, and had therefore this inducement, besides that imposed by the nature of their trust, to have the property sell most advantageously. They had a direct pecuniary interest in it, which they would lose by so acting as to effect a sacrifice of the property.

When it is considered that almost all the property sold came to the assignees heavily incumbered, and the holders of the claims against it, pressing for payment, and no resources at command by which cash could be raised for such an emergency, deeds of trust matured, executions in the hands of officers, a low and depressed state of the money market, the difficulty, every where, of raising money at that time, except at usurious rates of interest, if at all, on the security the property afforded, and that the large sum of fifteen thousand dollars had to be raised on the instant in order to save the property, all must admit the condition of the assignees was not without great embarrassment. They were not required to embark their own means to relieve the assigned property, nor to pay usurious interest to those who might have had the money to loan to extricate it. If it were incumbered, all that the assignees could legally do was to sell the property subject to the incumbrances. One of the holders of a trust deed testified he would have been willing to have delayed a sale for a month or two, if the assignees had requested it, but it is easy to be seen a delay of that kind, whilst other creditors were pressing, would have availed nothing. It would not have been of the least benefit unless all the creditors entered into such an agreement. One of the principal creditors, the largest creditor, who had ten executions in the hands of the sheriff, by which to make, by forced sale, more than eight thousand dollars, proposed to the other creditors to make a great discount on them and give time. The creditors, among them the complainants, are notified of this proposition. The assignees, who stand in the same relation to this fund, in one sense, as the complainants, being, like them, preferred

creditors, favor the proposition and agree to advance their pro rata share, but the complainants were unwilling to enter into the arrangement and would make no advances. Had they advanced, the results might have been more beneficial to them and to the other creditors.

Under the statute these executions in the hands of the officer, were a lien on all the personal property conveyed by the deed of assignment and were a prior lien, consequently, a purchaser under them need have no dread of the assignees. His title would prevail over theirs, and the facts show that in more instances than one, when property was brought out by the assignees to be sold, it was claimed under the executions, and taken possession of by the officer in charge, so that the assignees could do no otherwise than sell the interest of the Woodworths in the property. Under such circumstances, that it should bring but a trifle when sold, is not at all surprising, nor is it a fact or a presumption, from which negligence, fraud or improper management can be inferred. What else could be done? What other course could be adopted? Even at the sheriff's sale, under the paramount lien, the property did not pay the executions by three thousand dollars. If it did not bring its value at that sale, we know of no principle of law or justice which can make the assignees responsible therefor, nor does it afford ground for censure against them. The fact can not be denied that they could not raise money enough, by any private negotiation, at any reasonable rate of interest, to relieve the property from these prior liens. All the evidence tends to show this. No moneyed man would meddle with property so situated, except with the certain promise of heavy advantages in his favor. As to the real estate covered by deeds of trust and mortgages, the grantees in those deeds, the debts having matured before the assignment, were proceeding to sell, and did sell as they had a right to do. Any man could have been a bidder, and if the investment was a good one, as valuable as some of the witnesses state it to be, worth vastly more than the debt secured by them, why did not some one

take advantage of it? Why censure the assignees, because no one but those who did purchase was willing to buy? Why did not the complainants buy? They are represented to be business men, well informed as to the value of the property, and the field of competition was open to them. The fact must be conceded, there was not at that time, in the locality of those transactions, any surplus money to invest in such property, and that alone accounts for the small sums it brought, as compared with the original cost and its then estimated value. We have looked in vain through this voluminous record to find some proof of the fraud, negligence and improper management of this property with which the assignees stand charged, but find none. There is not, in our judgment, a scintilla of evidence to sustain this charge. The onus is on the complainants to establish it. Having failed in this the bill, as to the assignees, falls to the ground.

As to the other defendants, the purchasers of this property, or the greater portion of it, the charge of fraud, as to them must fall with the same charge made against the assignees. If the latter were guilty of no fraud, the former could not be, for their fraud depended on the fraud of the assignees, and so of the charge of collusion. On this branch of the case there may be a semblance for such a charge, but it has really no foundation in fact. It is quite apparent it was a general wish that the Woodworths should be placed in a position by which they would be enabled to continue their large establishment, in which every one in Aurora seemed to take an interest. It was the general opinion if the works stopped it would be to the great injury of the town, and when it was known that Butterworth was there with the view of helping "the boys," as he called them, out of their difficulties, all seemed to acquiesce, and there was perhaps a tacit understanding that matters should be so managed as that the property should go into the hands of the friends of Woodworths, but the record is barren of any evidence that such was the design of the assignees, or that they did any act to effect such a result, not warranted by law.

It is true one witness states (R. L. Carter) that while at Geneva he went to Mr. Mix, in the recording room, and asked his advice about bidding off the property, and Mix said he would not touch it, if he was in witness' place. This was the "stone shop premises." This, to say the most, was indiscreet on the part of the assignee, for it was not his business to give advice in the matter to his best friend, but it was not criminal—it was not conduct of a character to justify either of the charges made against the assignees. Alvin Woodworth and Butterworth, A. Reeves and some others, were present at this time. Woodworth called the witness and Butterworth together, and they wished that Reeves and witness should not bid on that property. Butterworth said he had not come there to make money, but to help the Woodworths out of the scrape, and that they wanted him to bid off this property, and he said if he did bid it off it would be for the benefit of the Woodworths and to help them, and if they would stand back and not bid on it, that it would be helping the Woodworths, and not him, to get out of the scrape they had got into.

Neither this witness nor Reeves bid on this property, for the reason they believed if Butterworth got it, and run the shop for the benefit of the Woodworths, they would get their pay, which was all they wanted. But they were not brought to this conclusion by anything the assignees or either of them said or did. It was brought about by representations made by Woodworth, that if Butterworth got the property he would continue the business, and they would not only be saved, but all the creditors would get their pay. The property was "a dead thing" as it stood, but if used it would amount to something.

This witness does not say, neither does Reeves, that they would have bid more than the amount of the Patten deed and the Huntoon deed, on this property. In fact, Carter expressly says, when he thought of bidding, he expected to pay the money secured by these deeds, but not the judgments against the property. These judgments were a lien on this property, and would have come in, if not otherwise satisfied, after the deeds of trust were

satisfied. In the whole record, the testimony of no witness can be found, going to show that he would have paid more for this property than the amount of those two trust deeds, and that amount these defendants, or Taylor, one of them, has paid. It is, therefore, of but small importance who got the property, no one being willing to pay more for it than was actually paid by the defendants, Taylor and the others.

But it must be borne in mind that these defendants, Taylor and the others, do not claim this property through a sale by the assignees or derive any title to it through any act of theirs. They claim the real estate they purchased under the deeds of trust and mortgages to Judson, and by redeeming from judgment sales. The sales under these deeds and mortgages were authorized by their terms and by judicial decree in the mortgage case, and the judgments were rendered by a court of competent jurisdiction. The sales were open and notorious and fair, the title, consequently, can not be made invalid by any acts of the assignees, no matter how illegal they may have been.

So as to the personal property, these defendants, Taylor and the others, do not claim that through any proceedings by the assignees under the deed of assignment. They claim by purchase under valid executions at a fair, open public sale by competent officers of the law, and on liens existing anterior to any rights acquired by the assignees, under the deed of assignment.

On what principle then is it, that these defendants should be required to surrender their title and property, and to those who have incurred no risk or trouble, or expended money in their acquisition? We know of none.

We find then, no evidence to sustain the charge of fraud and collusion set up in the bill. No evidence of any complicity between these defendants so to manage matters as that the property assigned should be sacrificed to the incumbrances upon it, and no evidence whatever, that the assignees have acted otherwise than with a scrupulous regard to the interest

of all parties, complainants included, and concur with the Circuit Court in the decree dismissing the bill.

The complainants' counsel make a point here, that the judgments confessed by the Woodworths in favor of Fridley, were irregular, and they are attacked on that ground. It is sufficient to say, an objection of this character, can not be sustained in this suit. Until reversed for irregularity they can be enforced, and if reversed a *bona fide* purchaser under them would be protected.

We are well satisfied there is not the semblance of a charge sustained against the assignees, and are further satisfied, that the purchases by the other defendants were *bona fide*, and their titles unassailable in this proceeding.

The onus of proving fraud and misconduct, being upon the complainants and they failing in their evidence, the Circuit Court could have made no other decree than was made, and that was, to dismiss the bill, and this decree we affirm.

*Decree affirmed.*