Baldwin v. Freydendall.

## REBECCA M. BALDWIN ET AL.

### V.

## THEODORE FREYDENDALL ET AL.

1. JUDGMENTS BY CONFESSION—JURISDICTION.—In the entry of judgments by confession under a warrant of attorney, the court obtains jurisdiction of the persons of the defendants by the appearance of the attorney. The latter is an attorney-in-fact, under a special and limited authority, which must be strictly pursued.

2. DEBT NOT DUE.—The statute authorizes confession of judgment upon debts due; but if, at the time judgment is taken, the debt is not due, the confession is not within the power given, and the judgment is a nullity.

3. PROMISSORY NOTE—DATE.—A promissory note takes effect from the time of its delivery. The date appearing as such on its face is presumed to be that time, but not conclusively, even against the parties to it.

4. ANTEDATING A NOTE.—Whenever justice requires it, the party to be injuriously affected by antedating a note may show the actual time of its delivery, and effect will be given or denied to the instrument accordingly. Subject to such proof an antedated note is as valid and effectual, from the time of its delivery, as if it were not antedated.

5. ANTEDATED NOTES—HOW CONSTRUED AS TO HAVING MATURED OR NOT.—A note dated "January 3, 1879," and payable "one day after date," will be deemed to be due at any and all times on and after January 7, allowing days of grace. The fact that it was not in existence nor delivered until the 25th of January would show that its operation during the interval was legally and physically impossible, but could not change the natural and proper meaning of its terms when it was delivered, and a judgment can be confessed thereon immediately upon the day of its execution and delivery.

Baldwin v. Freydendall.

6. FRAUDULENT PREFERENCES.—The fact that the creditors who obtained judgments by confession bore intimate relations to the debtors, the delay in the levy of the executions, the unusual time and order under which the assignee took possession, and the agency of the same attorney in all the proceedings, though perhaps casting suspicion upon the proceedings, are not in themselves sufficiently strong to sustain an imputation of bad faith, or a charge of fraudulent preference.

7. LEVY OF EXECUTION — WAIVER OF LIEN.—The executions in the hands of the officer were valid liens upon the property, and the subsequent delivery of the property by the officer to the assignee, did not divest such liens; the assignee took subject to the liens.

APPEAL from the City Court of Aurora; the Hon. C. D. F. SMITH, Judge, presiding. Opinion filed February 24, 1882.

Mr. R. G. MONTONY, for appellants; that a failing debtor has the right to prefer a creditor, cited Howell v. Edgar, 3 Scam. 417; Cross v. Bryant, 2 Scam. 36; Ramsdell v. Sigerson, 2 Gilm. 78; Ward v. Enders, 29 Ill. 519; Wooldridge v. Gage, 68 Ill. 157.

Both parties must have the intent to defraud before the court will set aside the conveyance: Ewing v. Runkle, 20 Ill. 449; Hatch v. Jordan, 74 Ill. 414.

The notes are not affected by antedating: Abrams v. Pomeroy, 13 Ill. 133.

The assignee succeeds to all the rights of the debtor in the property, and takes it with all its burdens: Goodwin v. Mix, 38 Ill. 115.

PLEASANTS, J. On Saturday, the 25th day of January, 1879, the Second National Bank of Aurora obtained two judgments by confession, in the city court of said city, amounting together to about $12,000, against William Laurence, Mason A. Higgins and Lyman Baldwin, composing the firm of William Laurence & Co., of said city, upon which executions were issued and delivered before noon to A. C. Graves, a deputy sheriff of the county of Kane.

This firm had previously been in good credit, and done a large business, but was at that time greatly embarrassed. Among others to whom it was indebted were the appellants respectively, of whom one was the wife of said Higgins

another the wife of Baldwin, and the third his sister, who, being advised of the entry of said judgments, placed their several claims in the hands of Mr. Canfield, the attorney who had acted for the bank, to be also secured or collected. They amounted together to nearly $3,500, and were in notes of the firm to said parties, respectively, which were all overdue. For these he took new ones at one day, but antedated, and with power of attorney attached for the purpose of enabling the payee to acquire liens for their security without delay, and during the afternoon of said Saturday, judgments by confession were entered in their favor for the amounts actually due, and executions thereon delivered to the deputy sheriff above named. Nothing was done, however, under said executions, or either of them, on that day. Mr. Graves testified that when those of the bank were put into his hands, the attorney told him to minute the time of their receipt and do his duty under the law; but it was then suggested that instead of making an exposure by closing the store during business hours without notice, Mr. Laurence should be first sent for, which was done; that when he came to the bank, about noon, and was informed of what had taken place, he complained of it as needlessly injurious; said the firm had on hand a stock worth over $40,000, and hoped his friends would help him to fix up the matter in thirty days; and that in view of this statement, and to give him an opportunity to ascertain whether any other arrangement that would be satisfactory could be made, further proceeding under the executions was delayed; but not long. On the next day he was directed by the president of the bank, who had received an intimation that some attachment was threatened, to make a levy as early on Monday as he could; and accordingly, at a few minutes after midnight, he went into the store, and, under the five writs above mentioned took possession of the entire stock. Meanwhile, a general assignment by the firm for the benefit of its creditors had been talked of and resolved upon. Mr. Laurence spoke of it to Mr. Dickinson, who was a director of the bank, within an hour after he was apprised of the entry of his judgments, and it was the subject of a conference between them later in the afternoon.

Baldwin v. Freydendall.

Throughout the next day Mr. Laurence and Mr. Higgins consulted Mr. Canfield in relation to it, but an assignment was not determined on until about nine o'clock in the evening, when they completed and exhibited to him a schedule of their indebtedness, and he thereupon promptly advised them that there was no other practicable alternative. The preparation of the necessary papers was then proceeded with, and shortly after midnight a deed in the usual form, providing for a distribution of the estate among all the creditors *pro rata*, and without preference, was made to Mr. Dickinson as assignee, who immediately took it to the store, and by virtue thereof demanded possession of the goods. This was refused by Mr. Graves, who claimed to hold under the executions; but after some discussion between them and the attorney, it was agreed that the assignee might have possession as custodian for the officer, while the inventory was being made, and longer if it should be deemed best, and a satisfactory arrangement therefor should be affected. Thereupon he received the assignment, gave bond for the faithful execution of his trust, and made and filed an inventory of the property as required by the statute. And in further pursuance of the agreement on the 6th day of February, he presented to the county court his petition under oath, setting forth the assignment and what he had done under it; the prior possession of the sheriff for the purpose of making a levy, and the willingness of the execution creditors to consent that the sheriff deliver to petitioner the possession of the goods, to be disposed of by private sale at retail, upon the entry by said court of an order which should authorize him so to dispose of them, and to pay out of the proceeds, first, the necessary expenses, second, the tax liens upon the property, and third, the residue from time to time upon said execution liens, until the same should be satisfied; that in his opinion such an arrangement would be advantageous to the unsecured creditors by reason of the fullness of the stock, and the value of the good will of the business; and praying for such an order. Upon which said court made an order " that said assignee have leave to sell and dispose of said stock as prayed in said petition, and that said petition be entered of record." A stipulation

was then signed by the execution creditors, that the officer should deliver full possession of the entire stock to assignee, " under the terms and conditions in the order of the county court contained," and possession was so delivered. The assignee made private sales at retail until the 14th day of August, realizing thereon the sum of $17,314.44, and then sold the residue of the stock in bulk for $4,240.00. Out of the proceeds he paid to the officer $7,196.74, from time to time, until the 19th day of March, 1879, when he was served with notice of an injunction from the U. S. Circuit Court.

On the 29th day of April, 1879, the original bill was filed herein, alleging the recovery by complainants, respectively, of judgments against the firm of Wm. Laurence & Co., on the 29th day of March (and later by those made complainants by amendment), and the return of executions thereon, " no property found;" the entry of the several judgments by confession on January 25th, the issuance of executions thereon, and time of receipts of the same, respectively, as hereinabove stated. It then charges a conspiracy by these execution creditors who were made defendants to the bill, their attorney, the assignors and assignee—with knowledge of the insolvency of said firm, in contemplation of a general assignment for the benefit of its creditors, and with intent to evade the statutory prohibition of preferences therein—to secure the payment in full of the claims of the bank and of said relatives of members of said firm, in fraud of the rights of other creditors, by means of the several proceedings had and taken by them respectively, as hereinbefore set forth; that in pursuance of such conspiracy, the assignee was then selling the property assigned, and paying over the proceeds to the sheriff to be applied on the executions of the defendants, and that the said property taken by the sheriff and delivered by him to the assignee was of value more than sufficient to satisfy all of said executions. And it prays, among other things, that the assignment be set aside; that a receiver be appointed; that said execution creditors, defendants, account for and pay over to such receiver all money and property received by them from the assignee ; and that said creditors, assignee, and sheriff, be enjoined from further proceeding

Baldwin v. Freydendall.

to collect said judgments or in any way disposing of or inter-
meddling with the assets of Wm. Laurence & Co., and the
members of said firm, from making any assignment or confess-
ing any judgment for the purpose of giving preference to any
creditor over the complainants; that said judgments confessed
on Jan. 25th be declared fraudulent, and the executions thereon
of no force after the surrender of the possession of the prop-
erty of said firm by the sheriff to the assignee, as against the
complainants; and for general relief.

Answers were filed and replications thereto, and from the
pleadings and proofs the material facts appear to be as above
stated.  On final hearing the city court decreed, among other
things, that the several judgments confessed in favor of Mrs.
Jenks, Mrs. Higgins and Mrs. Baldwin, together with the ex-
ecutions thereon and levies under the same, be set aside and
annulled—from which said last named defendant appealed, and
assigned for error that portion of said decree.  The judgments
in question appear to be regular in form, and there is no con-
tradiction of the evidence that the notes on which they were
entered were for *bona fide* indebtedness actually due before and
at the time when they were given.  But the complainants in-
sist that they were nevertheless rightly annulled on several
distinct grounds.  First, that they were void for want of juris-
diction of the persons of the defendants.

As we have seen, they were entered in vacation and by con-
fession under powers of attorney, without process.  In such
cases jurisdiction of the defendant's person is acquired by the
appearance of the attorney.  But the latter is an attorney-in-
fact, under special and limited authority and must therefore
strictly pursue it.  Chase v. Dana, 44 Ill. 262; Tucker v. Gill,
61 Id. 240, and cases there cited; Frye v. Jones, 78 Id. 632;
Keith v. Kellogg, 97 Id. 151.  Otherwise the defendant is not
bound, and the court gets no jurisdiction of the person, in
which case the judgment is so absolutely void, that it may be
attacked collaterally by any person who is affected by it.
Waterman v. Jones, 28 Ill. 54; White v. Jones, 38 Id. 162;
Miller v. Handy, 40 Id. 448; Campbell v. McCahan, 41 Id.
45; Huls v. Buntin, 47 Id. 396; Tucker v. Gill, 61 Id. 240;

Bannon v. The People, 1 Bradwell, 496. The statute authorized such judgments for .debts *bona fide* " due," and the powers in these cases purported to follow it in this particular. If then the debts were not due, the confession was not within the power given, and upon the authorities above cited the judgments were nullities. Complainant's counsel argues that they were not then due, from the facts that the judgments were entered on the same day that the notes were really given, and the notes were payable " one day after date;" which presents the question whether under the circumstances stated the legal " date" thus referred to was the day they were actually made and delivered, or the days respectively appearing on their faces, as dates—the latest of which was more than three weeks before the entry of the judgments. A promissory note takes effect, if at all, from the time of its delivery. The date appearing as such on its face is presumed to be that time, but not conclusively, even against the parties to it and *a fortiori* not against strangers. Whenever it is attempted, by antedating, to evade a statute, unjustly to impose or defeat a liability or accomplish any fraudulent or wrongful design—in short, whenever justice requires it, the party to be injuriously affected by such antedating, may show the actual time, and effect will be given or denied to the instrument accordingly. Thus, though it bear date of a day which was before the maker became of age, yet if it was in fact delivered after, the holder may show it by evidence *aliunde*, and it will be a good answer to a plea of infancy. So, if after dissolution of a copartnership and due notice thereof, one who had been a member should make a note in the firm name and dated as of a day before the dissolution, the others might defend against it by showing that it was made and delivered after the maker's power so to bind them had ceased by reason of such dissolution. But subject to such proof an antedated note will be as valid and effectual from the time of its delivery, as if it were not antedated. Story on Promissory Notes, Sec. 48; Edwards on Bills and Notes (side pp.) 150–1, and cases cited. Those here in question, though dated before, having been delivered on the 25th of January, 1879, took effect that day. But this did not

expunge or change the dates they bore, and the question remains whether they took effect as notes then due or as notes not due. On that question they speak for themselves in language whose meaning, if not doubtful of itself, can not be affected by the time of their delivery. For illustration, take the one given to Mrs. Jenks. It bore the date " Jan'y 3, 1879," in the usual place, and none other appeared upon any part of it.

To it the following promise to pay " one day after date," must refer; and taken together, they unmistakably mean that the note was to be deemed due at any and all times from and after the close of business hours on the 7th, allowing days of grace. The fact that it was not delivered nor in existence until the 25th, would show that its operation during the interval was physically as well as legally impossible, but could not change the natural and proper meaning of its terms when it was delivered. By the date used, its meaning on this point under consideration was clearly fixed that it was then due, unless it was delivered under a mistake as to the date, of which the law raises no presumption and the evidence furnishes no proof. The bill itself avers the contrary, and charges that the use of it was fraudulent and wrongful because intended to give the appearance of maturity to a note not really due, and thus also an apparent though not real authority to confess the judgment upon it, and the argument of counsel is to the same effect. This is an admission by the complainants, both of the natural meaning of the language used and of the intention of the makers so to use it. But an appearance of maturity intentionally given is a real maturity. And while it may be unusual to make a promissory note to be due upon delivery, yet if the parties so intend and use apt language to express it, we know of no law or reason which forbids it. Counsel admit the fitness of the antedate for this purpose, and also its validity as between maker and payee, but deny that it would be good as against " third parties in interest, particularly when such a holding is contrary to justice. "

If a debtor being *sui juris*, sees fit to give to his creditor his promissory note importing that the debt is presently due, we are unable to understand how any third party can have an

Baldwin v. Freydendall.

"interest" or be in any position entitling him to complain of it any more than of one payable at any future time, or of the terms employed to give it such import, provided they are apt. Even more generally in the case of any note, if there be no defense or equity which the maker can set up against it in the hands of the payee, we apprehend that it can not be contrary to justice to hold that no third party can object. We speak of this instrument as a note—not of other provisions or stipulations that might be contained in it, nor of a judgment confessed upon it. Here the firm of Wm. Laurence & Co. was under no legal disability; they were owing Mrs. Jenks, and the debt was *bona fide* due. By arrangement with her agent they gave their note for the amount, and in order to make it due upon delivery, as was agreed, used the antedate. This had no tendency to defeat the operation of any statute, or to subject to any liability any party besides the makers, or in any way that we can see to work a legal injury to creditors. Its sole object and effect was to make the note, as was the debt, presently due, and for this purpose we think it was both legal and effectual. Abrams v. Pomeroy, 13 Ill. 133; Luce v. Shoff (Ind.) C. L. Jour. Vol. 2, No. 3, p. 54. And so also as to those of Mrs. Higgins and Mrs. Baldwin.

Again, it is urged on the part of the complainants, that these judgments and those of the bank with the executions thereon, the assignment, the procuring of the order of the county court, and the stipulation under which the sheriff delivered possession of the stock of William Laurence & Co., together constituted one transaction; in which view the judgments and executions should be regarded as preferences in the assignment, and therefore void under the 13th section of the "Act concerning voluntary assignments," etc., approved May 22, 1877. Laws of 1877, p. 116.

This allegation is included in the charge of conspiracy made in the bill. The evidence relied on to sustain it is not direct or positive, but consists wholly of circumstances; such as the relations of these judgment creditors to the members of said firm, the delay of the levy of the executions, the unusual time and the order and manner in which possession was taken by

the sheriff, and the deed was made to the assignee, and the agency of the same attorney in all these proceedings.

However strong a suspicion these circumstances, unexplained, might raise, they are not shorn by the testimony of the strength required to sustain an imputation so sweeping and serious. In the light of connected facts they seem to be natural and consistent with good faith and honest purposes in all the parties. The fact that they followed in rapid succession as cause and effect, would not of itself tend to show that they were part of the same transaction, or that the parties thereto were in any sense conspirators. The meaning of the allegation is that each was had and taken with pre-arranged reference to all, and neither was complete, according to the purpose of the parties, without the others.

Let us see. First came the entry of the bank judgments. Now, although its president held the power of attorney for some weeks previously, yet it seems from the evidence that the entry of them was without notice, and the information thereof a painful surprise to the firm.

Now, is there any proof that either of these appellants had the slightest intimation of the intention or of the authority to take those judgments until after they were entered up? And while it is not improbable that Mr. Dickinson, being a director, knew of the power of attorney as having been taken for security in view of the amount of its claim and the embarrassment of its debtor, yet it does not appear that even he was aware of the actual entry of these judgments, or of the intention certainly to enter them until the executions thereon were in the hands of the deputy sheriff.

How, then, can it be said that these parties conspired with the bank officers to do an act without any knowledge or information of the intention to do it until after it was done? Then came these judgments that were set aside. Mr. Dickinson first learned of them on Sunday, the 26th of January, from Mr. Canfield; and it does not appear that any other officer of the bank received earlier information, even of the existence of the indebtedness. They could not then have been parties to a conspiracy to procure these judgments.

As to the assignment, which was next in order, the first intimation that the firm or any member of it contemplated such a step so far as the testimony discloses, was that given by Mr. Laurence to Mr. Dickinson, between 12 and 1 o'clock P. M. of the 25th, which was after the bank executions had been delivered to the officer; and nothing appears in the record to show that appellants, or either of them, or their attorney, heard of it before their own judgments were entered and executions issued; if not, it necessarily follows that these judgments and the assignment were not parts of the same transaction, and that when they were entered, the plaintiffs therein could not have been in a conspiracy with the defendants or the assignee, or even with each other, to bring about an assignment. Without pursuing the subject further, it must be manifest from the facts stated, that the charge of conspiracy and the allegation that the judgments, executions and assignment, constituted one transaction, to say the least are not sustained; and further, that the judgments were not taken in contemplation by the plaintiffs therein, of a general assignment by the defendants. Lastly, it is claimed that by the levy of the executions upon personal property of the defendants therein of value sufficient to satisfy them, and the subsequent suspension of the proceedings thereon, and delivery of the property by the officer to the assignee with the consent of the plaintiffs, the liens of said executions were lost and the judgments absolutely satisfied. (This point is made as well against the bank judgments as the others, and the refusal of the court below to set them also aside, is the ground of an appeal by the complainants upon this same record.)

We have held that the executions in the hands of the officer were valid liens upon the goods of Wm. Laurence & Co. Under them he levied upon their entire stock. Immediately thereafter, they made a general assignment to Mr. Dickinson for the benefit of their creditors, which we also hold was valid. He took, then, subject to these liens. Goodwin v. Mix, 38 Ill. 121; Dole v. Olmstead, 41 Id. 344; O'Hara v. Jones, 46 Id. 288. The estate assigned him was the residue of this stock, if any, which should remain after so much should be disposed of

at forced sale as would satisfy the executions, which amounted to $15,762.40 and costs.

It might reasonably have been doubted whether the stock, though invoiced at double this amount, would realize at forced sale more than enough to satisfy them. The character of the trust reposed in him, and the power conferred upon him by the deed and by the 11th section of the statute, made it the duty of the assignee to use at least ordinary care and diligence to get possession of the estate assigned and bring it to sale under advantageous conditions. Burrill on Assignments, Sec. 408 ; Goodwin v. Mix, 38 Ill. 115. From the established good will of the business and the character of the stock, it might well be supposed that the goods could be disposed of to better advantage by private sale at retail than by forced sale at public auction. But he could not get possession without providing for the claims of the execution creditors. They were already secured by the levy, and would not relinquish that security for any arrangement deemed less safe or otherwise less satisfactory. He had no means by which to pay or secure them; but they were willing to give him and his *cestuis que trust*, the unsecured creditors, every advantage they could without relinquishing or lessening their own security, and therefore to let him take possession as assignee and dispose of the stock at private sale by retail, if he would agree to apply the proceeds, after the payment of necessary expenses and taxes, upon their several liens until they should be satisfied—provided he would first obtain an order from the county court sanctioning the arrangement. The order was obtained, and possession of the goods given by the officer to the assignee with the consent of the execution plaintiffs, given upon the terms and conditions stated. The entire stock was afterwards disposed of by the assignee, who, out of the proceeds, from time to time paid over to the sheriff nearly half of the amount of said execution claims (when further payment was stopped by injunction out of a federal court), and has in his hands more than enough to. pay the balance. The results, from a business point of view, have indicated the judgment of the assignee in making this arrangement. We do not see

how it could give any additional advantage to the execution creditors, or injure those who were unsecured. That no wrong or fraud in fact was intended by the parties to it is further apparent from their application to the county court to sanction it in advance, and the publicity of the whole proceeding.

We have not been referred to any law forbidding such an arrangement on the part of the assignee, nor do we perceive any reason founded in public policy which should forbid it. Had the lien been of any other kind, we apprehend that no question of its validity or propriety would have been raised. If it was lawful, the complainants ought to be held bound by it; for after it was made, and before filing their bill herein, they all proved up and filed their claims with the assignee, pursuant to his notice published under the statute, and still insist in the argument here that they claim under the assignee and assignment (Field v. Flanders, 40 Ill. 470), though the prayer of the bill distinctly is to set both aside, and appoint a receiver, which is also consistent with and well founded upon the averments that the assignee was a conspirator, and the assignment a part of his scheme to hinder, delay and defraud them. The point under consideration is based upon the law relating to executions, and is technical merely, without any proof of conduct really inequitable on the part of these execution creditors or of the assignee, or of any actual injury inflicted upon the complainants. It is well settled that a levy on personal property of the defendant, of sufficient value to satisfy the execution, is a satisfaction not absolute, but *sub modo*—that is, in such a sense that the plaintiff can not have another, nor maintain an action on his judgment, nor redeem under it until the property levied on is fairly exhausted, or he accounts for it, and shows that without fault chargeable to him, he has in fact failed to get satisfaction out of it. Freeman on Executions, Sec. 269; Harris v. Evans, 81 Ill. 419. As that it has been fairly applied and proved insufficient, Freeman *ubi supra ;* or has gone back to defendant and been sold by him for his own use. Howard v. Bennett, 72 Ill. 297; or uner the statute which therein recognizes the principle, that the defendant gave a delivery bond and then failed to deliver. Martin v. Carter, 27 Ill. 294; Trenary v. Cheever, 48 Id.; and in other like cases.

Baldwin v. Freydendall.

In all these, the *prima facie* case of such satisfaction made by the levy is overcome, and the plaintiff may have another writ, or otherwise proceed upon his judgment as against either the defendant or third persons. But not as against the latter, if he voluntarily releases the property; or if the sheriff, who is his agent, *pro hac vice* wastes it, or experiments with unusual modes of sale, in which case the debt would be discharged, and his remedy, if he were not a party to the irregularity, would be against the officer. Smith v. Hughes, 24 Ill. 270; Harris v. Evans, 81 Id. 419. And as against the defendant in the execution, it is not satisfied if he voluntarily accept a return of the property by the sheriff. Howard v. Bennett, 72 Ill. 297, or by the plaintiff; for he is not bound to accept it, but may insist that the plaintiff shall sell and credit the proceeds. Freeman on Executions § 271. The reason of the law is obvious and just. The plaintiff has it in his power by means provided by the law, to satisfy his claim out of the property levied; and if by his own fault or that of his agent, he fails to do so, and suffers the property afterwards to appear discharged of the levy, he ought not to be allowed thus to keep subsequent creditors waiting, or again to take like property on the same debt as against subsequent purchasers or incumbrancers who may have been deceived by such apparent discharge, nor to harrass the debtor by multiplying levies.

So the law further is, that the lien of an execution levied or in the hands of an officer, may be postponed or lost as to creditors or others by an improper use of it, to hinder, delay or defraud them, as to bind the property but not make any immediate levy or sale—and to give it the effect of a mortgage,—to obtain better security merely, and not to sell unless forced by junior writs and the like; which may be shown by express directions not to levy or not to sell, even for a time (unless required to fit the property for a reasonably advantageous sale—as hides tanning in a vat) or what is tantamount to such direction. Freeman on Executions, § 206. And here also the reason is alike obvious and just. The only object and legitimate use of the writ is to enforce the plaintiff's judgment—to make the debt or damages by sale of the defend-

ant's property—not to serve as a mere security, or as a shield against executions of other creditors. The plaintiff has no right, either by a binding agreement or from motives of kindness to the debtor, or for any other reason, to put himself in a position where he can not or will not proceed regularly and in due time for its collection, and yet hold his lien so as to hinder, delay or prevent others. Ross v. Webber, 26 Ill. 221; Davidson v. Waldron, 31 Id. 121. The doctrine of *sub modo* satisfaction by a levy on sufficient property, and that of dormant executions, are established to prevent oppression of the debtor by an unfriendly creditor, or undue favor to him by a friendly one, at the expense of other creditors, and to their injury. And in all cases in which they are applied, the court has found one or more of these elements of wrong or danger.

In view of these rules of law and of the reason on which they rest, we think the evidence does not show against appellants, such a case of release of property or stay of proceedings after levy as would justify a decree, that their claims as against complainants were thereby satisfied in law, notwithstanding it is not pretended that they have been satisfied in fact.

Such a holding is asked of a court of conscience, by creditors claiming under a general assignment by the execution debtor, after the liens attached with knowledge—that whatever was done by way of release or stay, was done not to the prejudice, but in aid of the assignment, pursuant to an agreement with the assignee which was made for, and actually enured to their benefit. This does not seem quite equitable.

That by the delivery of the goods to the assignee, under the stipulation, the lien of appellants' executions were lost, is one proposition; that their judgments were thereby satisfied, their claims extinguished, is quite another. The first, we apprehend, is true. They expressly agreed that instead of collecting their judgments by means of the executions which had been levied, they would deliver the goods to the assignee, and accept, in consideration thereof, his promise to pay over all the proceeds of their sale, from time to time, after deducting necessary expenses and taxes, to the officer who held the executions, to be applied on the amount thereof, until fully paid.

On this promise, then, they must rely for satisfaction out of the proceeds of these goods. By means of it he got possession of the property, discharged of all existing liens, and thereby with the assignment, a clear legal title, which complainants as creditors of the assignors could not assail.

The executions on their judgments thereafter recovered would not have been created liens upon it, even if those of appellants and the bank had been effectually released. Nor did their equitable interest under the assignment extend to that portion of the proceeds which he so agreed to pay over. He did not acquire any interest in it himself by the assignment, but solely by the delivery of the possession thereof by the officer, with the consent of the only lien holders, which interest was charged by the same act with this trust in their favor as expressed in the stipulation and order of the county court therein referred to. What was the consideration for such delivery? His assumption of that trust had no connection with the assignment or with his duties, or the rights of creditors thereunder, except that it was the means, the only available and certain means, of getting control of the property assigned for the benefit of the creditors, including the complainants. On what principle of equity then, can they ask aid of the court to prevent its execution? What right or interest which they would have had if it had not been assumed, would be affected by it?

It is said that upon the release of the execution liens of appellants and the bank, the entire proceeds, instead of the residue only, would have been available for distribution among the creditors; and that the delivery of possession of the goods by them, or with their consent, after the levy was in law a satisfaction of these judgments, and therefore release of those liens, notwithstanding that by the same act the trust to pay appellants was created, and the delivery even upon those terms was beneficial to complainants, and that equity must follow the law. Where a positive rule of law is invoked to ovrride a clear equity, it must appear to be strictly applicable to the case presented. We think the doctrines of *sub modo* satisfaction by levy, and of dormant executions, do not apply here, for several reasons. The property levied on was not delivered to the defendants

in the execution, or to any one for their own use, and so possibly to be withheld from creditors, but to their general assignee, who was bound both by law and contract to sell to the best advantage he could, within a reasonable time and for the benefit of their creditors. This could not expose the property to waste, give the debtor a false credit, create a secret lien, expose purchasers to loss or other creditors to injury or delay. Again, the delivery to the assignee was not absolute or unconditional, but upon terms which made him a trustee for the execution creditors, for a purpose in no sense fraudulent or wrongful to anybody, but simply to pay an honest and secured debt with the least sacrifice of the debtor's property to the residue of which unsecured creditors must look for satisfaction of their claims. We have before shown that the operation of the doctrines under consideration as to other creditors, which is the case here presented, is to prevent the plaintiff, in the execution, from keeping his judgment unsatisfied when he has the means of satisfaction, and so a basis of continuing liens, to their delay and injury; which implies that but for their application of these doctrines he might, by the supposed release or stay, thus keep it unsatisfied. But by the alleged release in this case it is certain, from both the bill and the proof—showing the facts above stated —the contrary result would be produced and the aim of the law, to-wit, the satisfaction of the judgments out of the property taken, and in a reasonable time be secured—probably with greater advantage to other creditors than by the regular execution of the writs.

In this transaction, its features, operation or tendency is scarcely a resemblance to those which the law treats as a satisfaction of the judgment, and we think it would be a perversion of the law, and inequitable, to give it the effect of extinguishing large and honest debts without payment and without any actual fraud on the part of these creditors, or injury to others.

We are of opinion for the reasons above stated that the decree of the city court of Aurora, in setting aside and annulling, as against complainants, the several judgments, executions and levies of the appellants respectively, was erroneous.

And for the same reasons, that said decree in dismissing the bill as to the judgments of the bank, and from which complainants appealed on the same record, was right.   We therefore reverse said decree, and dismiss the bill as to appellants, Mrs. Jenks, Mrs. Higgins and Mrs. Baldwin, and affirm it in all other respects.

Reversed in part and affirmed in part.